**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH J. COMBS, | ) | CASE NO. 3:22-CV-1864-JRK |
| Plaintiff, | ) | |
| | ) | U.S. DISTRICT JUDGE |
| v. | ) | JAMES R. KNEPP, II |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | U.S. MAGISTRATE JUDGE |
| SECURITY ADMINISTRATION, | ) | JENNIFER DOWDELL ARMSTRONG |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    INTRODUCTION

Plaintiff Sarah J. Combs ("Ms. Combs") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1). U.S. District Judge James R. Knepp, II has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.    PROCEDURAL HISTORY

On September 27, 2019, Ms. Combs filed applications for DIB and SSI, alleging a disability onset date of November 12, 2018. (Tr. 94, 95, 201, 208).[1] These applications were denied initially and upon reconsideration. (Tr. 10, 118-24, 130-37). Ms. Combs requested a hearing before an administrative law judge ("ALJ"). (Tr. 138). On January 19, 2021, an ALJ held a telephonic

---

[1] The administrative transcript ("Tr.") is located at ECF Doc. 4 on CM/ECF.

hearing due to the COVID-19 pandemic, during which Ms. Combs, represented by counsel, and a vocational expert ("VE") testified. (Tr. 34-61).

On September 16, 2021, the ALJ issued a written decision finding that Ms. Combs was not disabled. (Tr. 7-23). The ALJ's decision became final on August 19, 2022, when the Appeals Council denied further review. (Tr. 1-4). Ms. Combs filed a Complaint on October 14, 2022. (ECF Doc. 1). She asserts the following assignment of error:

> (1) Administrative Law Judge (ALJ) Dianne S. Mantel incorrectly created and relied on a residual functional capacity (RFC) that produced relevant work while evaluating Ms. Combs under prong five of the sequential process by failing to account for off task and absences as a result of Ms. Combs' impairments and further failing to fully consider essential vocational expert testimony.

(ECF Doc. 7, PageID#523).

### III.  BACKGROUND INFORMATION[2]

#### A.  <u>Personal, Educational, and Vocational Experience</u>

Ms. Combs was born in 1996, and she was 22 years old on the alleged disability onset date. (Tr. 21). She has a GED, and she lives with her boyfriend. (Tr. 42, 44). At the time of the hearing, she had a valid driver's license. (Tr. 44). Her past relevant work was employment as a machine tender. (Tr. 21).

#### B.  <u>Relevant Hearing Testimony</u>

##### 1.  *Ms. Combs' Testimony*

Ms. Combs testified regarding her dizziness and fainting. (*See* Tr. 44-48). She stated that she has limitations with driving due to dizziness and "passing out." (Tr. 44). She testified that she has problems ascending and descending the stairs of the basement of her home because she has

---

[2] Because Ms. Combs' argument revolve around POTS, dizziness, and headaches, summary of the relevant evidence is limited to those related to these impairments.

dizziness, increased heart rate, and possible syncope.[3] (*Id.*). She testified that she is able to do laundry "if [she is] forced to do it by [her]self," but her boyfriend typically does most of the laundry. (Tr. 45). She testified that when she has a "decent day," she tries to help with other household chores such as sweeping, vacuuming, and cleaning the bathroom. (*Id.*). However, she testified that on these "decent days," she cannot fully do household chores because she will get dizzy, sick, and unstable; she will have to lie down; and her heart rate will increase. (*Id.*).

Ms. Combs testified that she experiences dizziness daily. (Tr. 48). She further testified that nothing helps with this dizziness, and she was not taking specific medication for it. (*Id.*). She stated that she was taking medication for POTS. (*Id.*). She further testified that her treatment providers had changed the medication dosage approximately twelve months before the hearing. (*See* Tr. 48-49).

Ms. Combs also testified that she experiences issues with migraines, and during this time she cannot function. (Tr. 49). Due to her migraines, Ms. Combs testified that she cannot withstand loud noises and must be in a dark room. (*Id.*). She also stated that she experiences head pain and needs to lie down. (*Id.*). She stated she has migraines "daily, every other day, every other two days" and that they are "never the same," but that there is "always a migraine near." (*Id.*). If she does not have a migraine, Ms. Combs testified that she is most likely experiencing a "strong headache." (*Id.*). At her last appointment—approximately a few months before the administrative hearing—Ms. Combs testified that her doctor increased the dosage of her migraine medication. (*Id.*). She stated that this medication was helping "somewhat," but that she still experiences migraines. (Tr. 50). Her family doctor has prescribed other migraine medications, but she only takes it "if need be." (*Id.*). She stated that this medicine "tend[s] to knock [her] out" and give her

---

[3] Syncope is also known as fainting. *See* Cleveland Clinic, Syncope, https://my.clevelandclinic.org/health/diseases/17536-syncope (last visited Aug. 4, 2023).

chest pain, paresthesia, and intense drowsiness. (*Id.*). Thus, if she wants to "get rid of the migraine," she has to "deal with the side effects." (*Id.*). She was unsure about whether her provider would do anything or was considering anything other than medication because her next appointment was scheduled approximately a month after the hearing. (*Id.*). Ms. Combs further testified that she experiences severe migraines that cause her to stay in a dark room and lay down "day to day, every other day." (Tr. 54).

## 2. *Vocational Expert's Testimony*

The vocational expert ("VE") testified that Ms. Combs had past relevant work with employment as a machine tender. (Tr. 56). For her first hypothetical, the ALJ asked the VE whether a hypothetical individual with Ms. Combs' age, education, and work experience could perform work if limited to light work, except that the individual can never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, and stoop; can frequently crouch, kneel and crawl; can frequently push and/or pull with their bilateral upper and lower extremities; cannot be exposed to  more than moderate noise; can have occasional exposure to extreme cold, heat, humidity, and wetness; cannot work around hazards; and cannot work around vibrations or perform any commercial driving.[4] (Tr. 57). The VE opined that this individual could not perform past relevant work but could perform work as a general office helper and mail clerk. (Tr. 58).

For her second hypothetical, the ALJ asked the VE whether a hypothetical individual with Ms. Combs' age, education, and work experience with the same limitations as the first hypothetical, except limited to sedentary exertion, could perform work. (*Id.*). The VE opined that

---

[4] This individual also had other limitations, including, that the individual can understand, remember and carry out simple, routine tasks, but not at a production rate pace; can make judgments on simple work and respond appropriately to usual work situations with occasional changes; can have occasional interaction with the general public, supervisors, and co-workers; cannot engage in direct public service work with the general public and with co-workers; cannot engage in team or tandem tasks; and cannot perform work that requires a strict production quota, but can perform goal-oriented work and meet end of day production quotas. (Tr. 57).

the individual could not perform past work, but could perform work as a document preparer, inspector, and surveillance system monitor. (Tr. 59).

Finally, the ALJ asked the VE to provide testimony as to regular breaks, on task requirements, and acceptable absences such that a person cannot perform work on a regular and continuing basis. (Tr. 60). The VE testified that employers will typically provide two 15-minute breaks and a 30-minute break in an eight-hour period. (*Id.*). The VE further testified that it is expected that an individual would be on task at least 85 percent of the time, which does not include breaks. (*Id.*). With respect to absences, the VE opined that employers would allow one unexcused absence each month. (*Id.*). Absences, including coming in late to and leaving early from work, that exceed this amount on a consistent and ongoing basis would be work preclusive. (*Id.*). The VE testified that the *Dictionary of Occupational Titles* does not addresses the issue of absences, on task, and breaks, so she relied on her experience as a vocational counselor to address those issues. (*Id.*).

### C.  Relevant Non-Medical/Medical Opinion Evidence

On January 25, 2020, Dr. Gary Hinzman, M.D., a state agency consultant, reviewed the record at the initial level of administrative review. Dr. Hinzman opined that Ms. Combs could perform light exertional level work, except that Ms. Combs could occasionally climb ramps/stairs, balance, and stoop; never climb ladders, ropes, or scaffolds due to her POTS diagnosis; frequently kneel, crouch, or crawl; and have no exposure to unprotected heights, hazardous moving machinery, or commercial driving due to her POTS diagnosis. (Tr. 72-73). Dr. Hinzman additionally opined that Ms. Combs could have unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, and fumes/odors/dusts/gases/poor ventilation. (Tr. 73).

On July 2, 2020, Dr. Leanne Bertani, M.D., a state agency consultant at the reconsideration level of administrative review, agreed with Dr. Hinzman's findings. (Tr. 104).

### D.  Relevant Medical Evidence

On July 25, 2018, Ms. Combs had a follow-up appointment for chronic dysautonomia. (Tr. 321). At the appointment, Ms. Combs reported experiencing work-related triggered episodes with difficulty breathing, chest pain, dizziness, and near syncope. (*Id.*). At the time, Ms. Combs was working full-time in an environment that was extremely hot. (*Id.*). Her orthostatic assessment was normal, her heart rate and rhythm were normal, and no murmurs were heard. (Tr. 322). The medical provider observed that Ms. Combs was doing well with her fluid intake, but that she had not been able to exercise consistently as instructed. (*Id.*).

On October 18, 2018, Ms. Combs presented for emergency treatment due to "generalized body aches," as well as left lateral neck pain radiating to the back of the head. (Tr. 358, 359). She reported that she was experiencing body aches that had been ongoing for more than six months. (Tr. 359). On review of body systems, Ms. Combs reported myalgias, neck pain, and headaches, but she was negative for weakness. (*Id.*). The physical examination findings showed that Ms. Combs showed normal range of motion of the neck, normal range of motion generally, normal muscle tone, and normal coordination. (Tr. 360). Ms. Combs also displayed normal mood and affect and normal behavior. (*Id.*). The final impression was described as body aches and a trapezius muscle strain. (Tr. 361). Ms. Combs was advised to follow up with her primary care physician as needed. (*Id.*).

On October 23, 2018, Ms. Combs presented for a follow-up examination, reporting stress, anxiety, depression, diarrhea, and vomiting. (Tr. 355). She stated that she felt "very achy." (*Id.*). Her review of systems was negative for neurological, cardiovascular, and musculoskeletal issues.

(Tr. 356). On examination, Ms. Combs was alert and oriented, had normal reflexes, and displayed normal range of motion. (Tr. 357). She appeared anxious and exhibited a depressed mood. (*Id.*).

On October 31, 2018, Ms. Combs had another follow-up examination. The medical provider noted no neurological or cardiovascular issues, but Ms. Combs was positive for myalgias. (Tr. 354). Ms. Combs reported fatigue. (*Id.*). Upon examination, Ms. Combs was tender at all fibromyalgia trigger points but had normal range of motion. (*Id.*). Ms. Combs was alert and oriented with normal mood and affects. (*Id.*).

On November 21, 2018, Ms. Combs reported that Lyrica had "helped her pain a great deal," and there were no side effects. (Tr. 350). Her physical examination results were similar to her October 31, 2018, examination results. (*Id.*). Her diagnoses included tension headaches, but the clinical findings remained the same. (Tr. 352).

On January 18, 2019, Ms. Combs presented with complaints of abdominal pain, nausea, fatigue, and diarrhea. (Tr. 345). She denied headaches, light-headedness, or weakness. (Tr. 345).

On January 23, 2019, Ms. Combs had a follow-up appointment for treatment of POTS. (Tr. 319).  Her orthostatic assessment was normal. (Tr. 320). However, the medical provider instructed Ms. Combs to watch her salt and fluid intake, and to exercise. (*Id.*). Ms. Combs' physical examination was described as "unremarkable." (*Id.*).

On April 3, 2019, Ms. Combs was seen for episodes of dizziness, heart palpitations, and nausea. (Tr. 335). She realized that she had not been taking her medication for the past five days and felt somewhat better when she restarted them. (*Id.*). Her neurological findings were positive for dizziness and weakness, but Ms. Combs was alert and oriented and had a normal mood and affect. (Tr. 337). Her cardiovascular findings were normal. (Tr. 336). On September 30, 2019,

upon examination, Ms. Combs' neurological symptoms were described as negative on a review of systems. (Tr. 333).

On December 4, 2019, Ms. Combs was seen by Dr. Suarez for evaluation of her POTS diagnosis. (Tr. 421). Ms. Combs reported "constant" fatigue and "intermittent" dizziness when she rapidly changed positions or walked for long periods of time. (*Id.*). Ms. Combs also reported having "constant" migraines, which she treated with a combination of Excedrin, Imitrex, and Ketorolac. (*Id.*). Dr. Suarez observed that Ms. Combs continued to experience a "significant number of symptoms," but noted that her "clinical examination look[ed] quite good" and she did "not appear to have abnormal clinical cardiac output." (Tr. 422). Dr. Suarez recommended Provigil for fatigue and advised Ms. Combs to exercise, even if only "the upper body for now." (*Id.*). Dr. Suarez asked Ms. Combs to follow up in six months. (*Id.*). Ms. Combs was referred to psychiatry due to her psychological symptoms and neurology for headaches. (Tr. 441).

On January 16, 2020, Ms. Combs presented for a medical appointment with chief complaints of insomnia and depression. (Tr. 439). She also reported headaches. (Tr. 440). Her physical examination was normal. (Tr. 441).

On April 15, 2020, Ms. Combs underwent a neurological evaluation. (Tr. 452). Ms. Combs stated that she was referred for evaluation of migraine-type headaches. (*Id.*). She stated that she had been using Imitrex as directed, and Toradol when Imitrex was ineffective. (*Id.*). She reported episodes of syncope once a month on average. (*Id.*). She stated that her migraines started when she was 15 and that she had "at least 20 days of headaches" each month. (Tr. 452). Ms. Combs described her headaches as bifrontal and "pounding in nature" with associated nausea, photophobia, and hyperacusis, but no vomiting. (*Id.*). She did not have significant visual aura. (*Id.*). Her headaches became worse with motion. (*Id.*). On examination, Ms. Combs was alert and

oriented with normal speech, and her motor strength, gait, and cerebellar function were normal; however, a "formal neurological examination could not be performed" because of the nature of the telehealth visit. (Tr. 453). Dr. Lamancusa recommended that Ms. Combs read information about Aimovig and indicated he would provide samples if she was interested. (*Id.*). Dr. Lamancusa instructed Ms. Combs to return in May. (*Id.*).

On May 16, 2020, Ms. Combs returned to see Dr. Lamancusa. (Tr. 451). On examination, Ms. Combs was alert and oriented. (*Id.*). Her cranial nerves showed full extraocular movements, and jaw and facial strength were normal. (*Id.*). Her hearing was intact. (*Id.*). Ms. Combs also had full motor strength, normal reflexes, normal gait, and normal sensory function. (*Id.*). Dr. Lamancusa provided samples of, and a prescription for, Aimovig. (Tr. 451). He requested that Ms. Combs return for a follow-up appointment in September. (*Id.*).

On September 22, 2020, Ms. Combs attended her scheduled follow-up appointment with Dr. Lamancusa. (Tr. 476). Ms. Combs reported that her migraines were "better." (*Id.*). She reported experiencing paresthesias, which she thought may be related to her medication (Aimovig). (*Id.*). She reported a 50% improvement in her headaches and was receptive to increasing Aimovig. (*Id.*). The results of her physical examination performed at that time was unremarkable. (Tr. 477).

On November 3, 2020, Ms. Combs reported "fairly frequent" episodes of syncope or near syncope. (Tr. 492). She described dizziness and lightheadedness prior to the episodes. (*Id.*). She reported experiencing loss of consciousness about two times per month. (*Id.*). She reported that her symptoms were worse with heat. (*Id.*). Her physical examination was unremarkable, but an implantable loop recorder placement test was recommended due to concerns that a cardiac rhythm disorder could be causing episodes of syncope. (*Id.*).

On November 13, 2020, Ms. Combs reported fuzziness and frequent headaches but denied loss of consciousness, weakness, numbness, or seizures. (Tr. 490). On November 17, 2020, Ms. Combs underwent an implantable loop recorder placement for syncope and near-syncope episode "for which an etiology [had] not yet been uncovered." (Tr. 484). The purpose of this placement was to determine whether episodes were due to a cardiac rhythm disturbance. (*Id.*).[5]

## IV.    THE ALJ'S DECISION

In her September 2021 decision, the ALJ determined that Ms. Combs had not engaged in substantial gainful activity since November 12, 2018, the alleged onset date. (Tr. 13). The ALJ further determined that Ms. Combs had the following severe impairments: postural orthostatic tachycardia (POTS)[6] with tachycardia; migraines; fibromyalgia; and psychological conditions "variously described as" major depressive disorder, panic disorder, generalized anxiety, post-traumatic stress disorder, borderline personality disorder, and probable psychosomatic symptoms. (Tr. 13). The ALJ, however, found none of these impairments—individually or in combination— met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix. (Tr. 14).

The ALJ also determined that Ms. Combs could perform light work, except that she can never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, and stoop; and frequently crouch, kneel, and crawl. (Tr. 15). Ms. Combs was further limited to frequently pushing and/or pulling with her bilateral upper and lower extremities; no exposure to more than moderate noise; occasional exposure to extreme cold, heat, humidity, and wetness; no work around

---

[5] The results of this test are not in the record because Ms. Combs' counsel did not submit the evidence during the post-hearing period nor request additional time to submit them. (Tr. 19).
[6] Postural orthostatic tachycardia, POTS, is a condition that causes one's heart to beat faster than normal when one transitions from sitting or lying down to standing up. *See* Cleveland Clinic, Postural Orthostatic Tachycardia Syndrome (POTS), https://my.clevelandclinic.org/health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots (last visited Aug. 4, 2023).

hazards such as unprotected heights, heavy moving machinery, or unprotected moving mechanical machinery; no work around vibrations; and no commercial driving. (*Id.*). The final limitations that the ALJ included was that Ms. Combs can understand, remember, and carry out simple, routine tasks but not a production rate pace, such as required working on an assembly lime or conveyor belt; can make judgments on simple work; can respond appropriately to usual work situations with occasional changes; can have occasional interaction with the general public, supervisors, and coworkers; cannot engaged in direct public service work with the general public and with coworkers; cannot engage in team or tandem tasks; and cannot perform work that requires strict production quotas (*i.e.*, piecework), but can perform goal-oriented work and meet end of day production quotas. (*Id.*).

The ALJ next determined that Ms. Combs is unable to perform any past relevant work. (Tr. 21). The ALJ also determined that transferability of job skills is not an issue in this case because Ms. Combs' past relevant work is unskilled. (Tr. 22). Considering Ms. Combs' age, education, work experience, and residual functional capacity, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Ms. Combs can perform, including a general office helper, cleaner, mail clerk, document preparer, inspector, and surveillance system monitor. (*Id.*).

## V. LAW AND ANALYSIS

### A. <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986)

(*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

12

### B.  <u>Standard for Disability</u>

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C.  <u>Analysis</u>

Ms. Combs argues that the ALJ's RFC determination was incorrect because the finding did not include restrictions "based on off task allowances in the workplace, or absences, due to [her] impairments, specifically from her migraine headaches, dizziness, and syncope" due to her history of POTS. (ECF Doc. 7, PageID#525-27). Ms. Combs also contends that the ALJ further erred by failing to fully consider the VE's testimony that being off-task more than 15% of the day and missing more than one day a month would be work preclusive. (*Id.* at PageID#527). For the following reasons, I disagree.

The ALJ appropriately evaluated Ms. Combs' subjective complaints under SSR 16-3p in crafting her RFC finding. As part of the RFC determination, the ALJ evaluates the persistence of symptoms to determine how symptoms limit the capacity for work. 20 C.F.R. §§ 404.1529(c), 416.929(c). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Although the ALJ should consider the entire record, there is no requirement that the ALJ discuss every factor that was considered in reaching her conclusion or provide a factor-by-factor analysis. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009); *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence."). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statement about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029, at *9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, [s]he must clearly state [her] reason for doing so."). On review, courts must "accord the ALJ's determination of credibility great weight

14

and deference particularly since the ALJ as the opportunity, which [the courts] do not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (citations omitted).

Here, the ALJ appropriately evaluated Ms. Combs' subjective complaints and concluded that, while her impairments resulted in a limitation to light exertional level work subject to several non-exertional limitations, the record did not support any limitations beyond those listed in the RFC finding and did not support Ms. Combs' allegations. The ALJ discussed pertinent factors in reaching her RFC determination. For example, the ALJ discussed the objective medical evidence. "[O]bjective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities." *See* SSR 16-3p, 2016 WL 1119029, at *5. Although the ALJ may not reject a claimant's subjective complaints "solely" on this basis, the ALJ may nonetheless consider objective evidence in evaluating a claimant's subjective complaints. *Id.*; *see Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2014) (finding the ALJ had not erred because the ALJ considered the objective medical evidence as well as the medical opinion evidence in discounting claimant's subjective allegations). The ALJ discussed Ms. Combs' physical examination findings, noting that Ms. Combs displayed a normal range of motion, normal strength, normal coordination, normal reflexes, and normal gait at these examinations. (Tr. 17-19; *see* Tr. 354, 357, 359, 360, 451, 453). At one point, Ms. Combs' medical provider even described her physical examination as "unremarkable." (Tr. 492). The ALJ also discussed objective medical evidence associated with Ms. Combs' reported headaches, dizziness, or syncope. But those objective findings did not indicate disabling level issues. For example, despite Ms. Combs' reports,

the ALJ pointed to contemporaneous examinations where her neurological findings were described as normal or negative. (Tr. 333, 350, 354, 356).

In addition to the objective medical evidence, the ALJ also discussed the treatment Ms. Combs received and the effectiveness of that treatment when discounting Ms. Combs' subjective allegations. This is another proper factor that an ALJ may consider. 20 C.F.R. § 416.929(c)(3)(v) (ALJ may consider "[t]reatment, other than medication, you receive or have received for relief of your pain or other symptoms[.]"). For example, the ALJ discussed the medications that Ms. Combs took and their efficacy. The ALJ observed that, in April 2020, Ms. Combs saw a neurologist for complaints of migraines, reporting that she was experiencing headaches 20 days out of the month with nausea, photophobia, hyperacusis, but not vomiting. Ms. Combs was taking Imitrex and Toradol. (Tr. 19; *see* Tr. 452). Dr. Lamancusa prescribed Aimovig[7] and instructed for Ms. Combs to return in September. (Tr. 451). The ALJ also observed that in September 2020, Ms. Combs returned for her follow-up appointment and reported that her migraines were doing "better" and experienced 50% improvement in her headaches while taking Aimovig. (Tr. 19; *see* Tr. 476). The ALJ also observed Ms. Combs' noncompliance with her treatment. *See Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 789 (6th Cir. 2017), *aff'd sub nom.*, *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019). Specifically, the ALJ observed that at an April 3, 2019 examination, Ms. Combs reported dizziness and heart palpitations, but she also reported that she had not taken her medication for five days. (Tr. 17; *see* Tr. 335).

The ALJ also considered Ms. Combs' daily activities, which is a factor that an ALJ may consider in her SSR 16-3p analysis. 20 C.F.R. § 416.929(c)(i) (daily activities is a relevant factor

---

[7] Aimovig is the U.S. brand name for Erenumab-aooe, a subcutaneous injectable medication prescribed for migraine prevention in adults. *See* Mayo Clinic, Erenumab-Aooe (Subcutaneous Route), https://www.mayoclinic.org/drugs-supplements/erenumab-aooe-subcutaneous-route/description/drg-20443746 (last visited Aug. 4, 2023).

to evaluating claimant's subjective symptoms); *Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) ("[T]he ALJ did not give undue consideration to Temples' ability to perform day-to-day activities. Rather, the ALJ properly considered this ability as one factor in determining whether Temples' testimony was credible."). Specifically, the ALJ observed Ms. Combs reported daily activities such as preparing simple meals, driving, watching television, and performing some household chores. (Tr. 15-16, 21; *see* Tr. 44-46). While these activities alone may not conclusively establish Ms. Combs' ability to engage in full-time work, these daily activities are nonetheless a relevant factor that the ALJ could analyze when assessing her residual functional capacity. *Dodson v. Comm'r of Soc. Sec.*, No. 5:18-CV-02263, 2019 WL 6841771, at *3 (N.D. Ohio Dec. 16, 2019) ("[W]hile merely citing to a claimant's daily activities cannot conclusively establish an ability to engage in full-time work, it is also true that a claimant's capacity to perform tasks in daily living is a legitimate factor to be considered in assessing the claimant's functional capacity.").

Beyond assessing the consistency of Ms. Combs' allegations, the ALJ also considered the opinion evidence of the record. Although Ms. Combs argues that the ALJ should have included limitations for being off task, additional breaks, and absences, no medical source in the record opined that Ms. Combs required such limitations. Indeed, the state agency medical consultants, despite recognizing Ms. Combs' severe impairments, opined that Ms. Combs was capable of performing work at the light exertional level, subject to several postural and non-exertional limitations, including occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasionally balancing and stooping; frequently kneeling, crouching, or crawling; and no exposure to unprotected heights, hazardous moving machinery, and commercial driving. (Tr. 21; *see* Tr. 72-73, 104); *Lipayne v. Comm'r of Soc. Sec.*, No. 1:18 CV 273, 2019 WL 1261416, at

*6 (N.D. Ohio Jan. 29, 2019), *report and recommendation adopted*, 2019 WL 1396921 (N.D. Ohio Mar. 28, 2018), *aff'd sub nom.*, *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165 (6th Cir. 2020) ("Here, no physician of record offered such an off-task limitation, despite recognizing Plaintiff's [impairments]."); *see Turkovich v. Comm'r of Soc. Sec.*, No. 1:12 CV 01633, 2014 WL 29039, at *8 (N.D. Ohio Jan. 2, 2014) ("While Plaintiff suggests the need for additional workday breaks, she points to no medical source, including Ms. Ball prescribing this requirement or any other limitation not already included in the hypothetical. Plaintiff also notes no case law indicating that the symptoms arising from her mental impairments translated into a need for additional breaks or further limitations."). In crafting Ms. Combs' RFC, the ALJ accounted for the state agency's opined limitations and even imposed additional restrictive limitations. (Tr. 15, 21).

Ms. Combs' primary reliance on her testimony, subjective complaints, or diagnoses to establish that she had further limitations is unavailing. To the extent that Ms. Combs attempts to rely solely on her testimony and subjective complaints, a claimant's recitation of her symptoms alone does not conclusively support further limitations. *See* 20 C.F.R. §§ 404.1529, 416.929 ("However, statements about your pain or other symptoms will not establish that you are disabled…"). And to the extent that Ms. Combs attempts to use her POTS diagnosis as evidence of further limitations, it is well-established that a diagnosis does not establish the severity of a condition, or the functional limitations caused by the condition. *See Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of…impairments…does not establish that [the claimant] was significantly limited from performing basic work activities for a continuous period of time."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1998) ("[M]ere diagnosis of arthritis … says nothing about the severity of the condition."); *Baker v. Colvin*, No. 1:15-CV-00910, 2016 WL 4128435, at *13 (N.D. Ohio Aug. 3, 2016).

18

Ms. Combs also argues that her "extensive medical history" of POTS, specifically dizziness and migraines, also supports the additional limitations she contends should have been included. (ECF Doc. 7, PageID#526). The presence of some evidence is not alone a sufficient reason for remand. So long as the ALJ's decision is supported by substantial evidence, courts "must defer to that decision 'even if there is substantial evidence in the record that would have supported and opposite conclusion.'" *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 667 (6th Cir. 2009) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). As this Report and Recommendation discusses above, the ALJ pointed to objective evidence related to Ms. Combs' condition that was inconsistent with her allegations, and the ALJ ultimately reach a different conclusion regarding Ms. Combs' limitations rather than Ms. Combs' preferred conclusion. In addition, the ALJ considered opinion evidence that did not find the limitations Ms. Combs asserts should have been included in the RFC determination. The Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

Finally, Ms. Combs argues that the ALJ "failed to fully consider essential vocational expert testimony" that being off task more than 15% of the time or missing more than one day of work a month would be work preclusive. (ECF Doc. 7, PageID#527). Relying on this testimony, Ms. Combs contends the ALJ erred because her RFC determination was "devoid" of these limitations. (*Id.*). However, Ms. Combs fails to acknowledge that the ALJ's hypothetical never included those specific limitations in the hypothetical question on which the RFC finding was based. (Tr. 15, 56-58). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey*

*v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 588 (6th Cir. 2013) ("[T]he ALJ is only required to incorporate, as part of that examination [of the VE], evidence that is deemed credible."). Thus, Ms. Combs does not establish the VE testimony she references is relevant. Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court reject Ms. Combs' assignment of error and AFFIRM the Commissioner's final decision.

Dated: August 7, 2023                                   *s/ Jennifer Dowdell Armstrong*
                                                       Jennifer Dowdell Armstrong
                                                       U.S. Magistrate Judge

## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).